UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW JACOB QUINTERO,<br><br>        Petitioner,<br><br>    v.<br><br>DAVID LONG, Warden,<br><br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:13-cv-01251-JLT<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE FILE<br><br>ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY |

In 2010, Petitioner was convicted of various crimes of violence which resulted in the court imposing a term of incarceration for life with other terms running concurrently with this sentence or being stayed. Here, Petitioner claims his due process rights were violated by the trial court's decision to preclude the testimony of his expert. Because the Court disagrees, the petition is **DENIED**.

I.    **PROCEDURAL HISTORY**

Petitioner was convicted in the Fresno County Superior Court in 2010 of inflicting corporal injury resulting in a traumatic injury upon the mother of Petitioner's child, battery with serious bodily injury, assault with a deadly weapon, torture, and criminal threats. (Doc. 14, Ex. A, p. 3). The Superior Court sentenced him to an indeterminate life term for the torture conviction, while the terms for the other convictions and enhancements were either stayed or ordered to run concurrently with the indeterminate life term. (Id.).

Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed the convictions. (Doc. 14, Ex. A). Likewise, the California Supreme Court denied his petition for review. (Lodged Document ("LD") 21).

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

On the afternoon of July 28, 2009, appellant went to the house of Cindy Garcia, his former girlfriend and mother of two of his children, a boy and baby girl. Garcia testified that she was in the bathroom, taking a bath, when she heard a loud bang on her bathroom door and then appellant's voice telling her to open the door.

The bathroom door was locked, but appellant was able to open it and walked in. Garcia told appellant to leave. Appellant said no and started taking his clothes off. Appellant asked Garcia to have sex with him. Although she said no, they started having sex.

Appellant "got off real quick" when he noticed "hickeys" on Garcia's body. He became angry, told her to get dressed, and questioned her about the hickeys. While they were still in the bathroom, appellant "sock[ed]" Garcia on the side of her face near her eye.

Appellant then grabbed Garcia by her hair and dragged her to her bedroom. Her children were asleep on a futon mattress in the corner of the bedroom. Appellant started closing all the windows in the bedroom, while telling Garcia "how he should beat [her] ass and calling [her] a bitch and a [whore]."

As Garcia was sitting on the bed, appellant came up and "socked" her in the side of the face with a closed fist. The blow caused Garcia to fall backwards off the bed. As Garcia was lying on her back, appellant "just lost it." He started hitting her with his fists and said he was going to kill her. Appellant hit Garcia's arms when she put her hands up in front of her to try to block appellant's blows.

Appellant then lifted Garcia up by one of her arms and hit her "hard" in the side. Garcia heard one of her ribs break and began to have trouble breathing. Appellant stopped and asked, "Was he worth it? Was he worth it?" Appellant then lifted Garcia up by the arm again and hit her two more times in the side. Garcia heard another rib break.

Appellant demanded that Garcia give him her new boyfriend's telephone number. Garcia gave him the number and appellant called it. Garcia heard appellant talking to her boyfriend's sister. He said something like, "You better tell him to come and get her because she's going to die" and "I fucked her up. I beat her ass."

Garcia asked appellant to call the ambulance. Appellant accused Garcia of "over-exaggerating" and told her to get their son's stuff together. Appellant tried to pick Garcia up by her arm, but she threw herself back down on a pile of clothes.

While Garcia was lying on the pile of clothes, appellant took "a wizard knife" from off the entertainment center. He pulled the blade out and said, "I'm going to cut your pussy."

Garcia packed their son's bag and appellant left with the boy. After appellant left, Garcia's other

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

2

son helped her walk to a neighbor's house. The neighbor called the police.

Around 3:00 p.m., Fresno County Sheriff's Deputy Jose Diaz responded to the call regarding a domestic disturbance. When he arrived, emergency personnel were tending to Garcia. Garcia was sitting on the ground. She appeared scared. She was crying and having trouble breathing.

Garcia told Deputy Diaz that her boyfriend and father of her children had assaulted her and described the assault to him. Garcia said that after appellant brought her into the bedroom, he sat her down on the bed and hit her with a full bag of clothing. He then demanded that she tell him who gave her the hickeys.

When Garcia told appellant the name of her new boyfriend (i.e., "Andrew"), appellant thought she was being sarcastic because this was also appellant's name. Appellant punched Garcia in the left side of her face with a closed fist, causing her to fall off the bed onto the ground.

After Garcia fell onto the ground, appellant "picked her up and proceeded to punch her several more times on the left side of her body or the left flank of her torso." After punching her in the flank, appellant "proceeded to stomp her upper torso, or chest, approximately eight to ten times" and "to kick her on the upper torso numerous times" while she was lying on her back. Finally, appellant sat on Garcia's chest and started choking her with his right hand. Appellant only stopped when Garcia's youngest son ran into the room.

Garcia also told Deputy Diaz about appellant's threats to kill her and cause injury to her vaginal area. Garcia reported that she feared for her life and believed appellant was capable of carrying out his threats. Garcia explained that this was not the first time she had been a victim of domestic violence. She told Deputy Diaz that appellant had abused her on approximately 10 prior occasions, but she never reported the abuse because she was afraid of appellant.

Dr. Suneil Agrawal was the emergency room physician who treated Garcia after the incident. Garcia told Dr. Agrawal that appellant assaulted her for a period of approximately 30 minutes, and said he tried to choke her, pulled her hair, knocked her down, and kicked and punched her. Dr. Agrawal opined that Garcia's injuries were consistent with the attack she described.

Dr. Agrawal observed that Garcia had bruising on her arm, chest, and left flank. She also had a large area of swelling (hematoma) above her left eye. A computed tomography (CT) scan revealed fractures in two ribs, a laceration to the left kidney, and a pneumothorax. Dr. Agrawal explained that a pneumothorax involves a penetrating injury to the body cavity, so that air escapes inside and the lung deflates. He treated the pneumothorax by inserting a chest tube. Dr. Agrawal opined that the pneumothorax was most likely caused by the rib fractures and the laceration to the kidney could have been caused by blunt trauma.

On cross-examination, Dr. Agrawal testified that Garcia's injuries were not consistent with a single fall against a hard object. He explained:

> "One, the hematoma above her left eye was towards her front, while the injuries in her thorax area were on her back mostly, which wouldn't be consistent with one fall. Number two, she had mentioned that she was choked. And there were several spots on her neck that had developed that were consistent with what we had seen with fingerprints or hands at least."

Defense counsel questioned Dr. Agrawal further:

> "Q. The rib injury by itself, could you get a rib injury like that from falling into a hard object?
>
> "A. Not very easily.

3

> "Q. Why not?
>
> "A. I don't—it takes quite a bit of force to break a rib or even two ribs. And falling on to a hard space just from ground, I don't know that I've ever seen that that I can recall. In a patient who is younger and not osteopenic, meaning they have low bone density such as an elderly patient.
>
> "Q. You say it takes quite a bit of force to break a rib?
>
> "A. It can.
>
> "Q. Have you known of people to break ribs in relatively low impact sports such as golf or rowing a boat?
>
> "A. Yes. I've read about those cases. I don't think I've seen that myself.
>
> "Q. Have you ever known of people to break a rib by coughing?
>
> "A. I've seen that in one or two patients. And they have been cancer patients."

Defense counsel also presented Dr. Agrawal with a hypothetical: "If someone jumped on my back and I threw them off my back and they landed up against a hard object such as a wall heater, could that possibly break a rib?" The doctor responded:

> "I mean, I don't know the body mass of the person. I don't know their past medical history. I don't know what they hit from how far, what force is generated, how strong the person is on the ground. I suppose it would be possible, but I would think it's unlikely."

On redirect examination, Dr. Agrawal testified that he saw nothing in Garcia's records or in examining her that would indicate the 28–year–old had any deficiencies in her bone structure anatomy.

Laura Woods, a registered nurse and sexual assault forensic examiner, examined Garcia on July 30, 2009. Woods observed that Garcia had multiple bruises on her arms and legs, her neck, around her eyes, and on the left side of her back near the top of her ribs. Woods opined that the circular pattern marks she found on Garcia's neck corroborated Garcia's statements that appellant choked her.

Woods also observed that Garcia had fractured ribs and a chest tube in place to treat the pneumothorax she sustained "from a blunt force injury to the area of her ribs." On direct examination, the prosecutor questioned Woods about the amount of force necessary to cause Garcia's injuries:

> "Q. Do you know how much force it takes to cause those injuries?
>
> "A. To fracture ribs and cause a pneumothorax takes a pretty good blow.
>
> "Q. What are the kinds of things that in your experience have caused that kind of force?
>
> "A. In my experience with patients—in the emergency department I had a young man who was in an ATV accident, all terrain vehicle accident. I had a gentleman that was pinned under a car. The car somehow fell from the back and landed on him and he took a blow to the ribs.
>
> "Q. Would it be fair to say it takes a lot of force to cause those injuries?

> "A. Yes, that would be fair to say.
>
> "Q. Would those injuries be consistent from a fall from a bed to the floor?
>
> "A. Doubtful unless she landed on an object that made the floor not a flat surface.
>
> "Q. What would be the kind of objects you'd be looking for?
>
> "A. Something hard. Something large that she would have landed on.
>
> "Q. Would there still have to be an application of force involved?
>
> "A. Yes. Yes. Blunt force."

On cross-examination, Woods acknowledged that rib injuries like Garcia's "could be" sustained as a result of the victim jumping on top of someone and then being tossed off and landing on a heater in the corner of the room.

The prosecution also called Bob Meade, a licensed marriage and family therapist, as an expert on domestic violence. Meade testified generally about common behaviors of domestic violence victims. Meade explained that victims often feel guilty after calling law enforcement and recant their reports of abuse, even when they have suffered serious injuries like broken bones.

**Defense**

Appellant testified that he went to Garcia's house on July 28, 2009, to pick up his son and the rest of his belongings and that he had a key to the house. According to appellant, Garcia was the one who started the physical altercation. She jumped on his back three times to prevent him from leaving and each time he threw her off. One of the times he threw her off, appellant saw Garcia hit the wall where the heater was located, so she could have hit the heater.

Appellant denied that he threatened to kill Garcia or that he engaged in the assaultive behaviors she described in her trial testimony and to law enforcement and medical personnel at the time of the incident. Appellant also denied that he displayed the blade of his knife or threatened to cut Garcia with it.

Appellant testified that he had seen Garcia inflict injuries upon herself in the past. Every time he would try to leave her, she would hit her face and scratch her arms. When he asked her why, she would say, "because I can't beat you up so I'm going to do it to myself." Appellant also testified that Garcia often faked injuries after they would fight.

Mary Ruth Quintero, one of appellant's sisters, testified that, about a week after the incident, Garcia asked her to take care of her kids. Garcia told her "she might go to prison because of what she said that wasn't true." On cross-examination, Mary Ruth testified that Garcia told her that appellant did not break her ribs, rape her, or anything like that. Garcia told Mary Ruth that, when she was telling appellant not to leave, he pushed her and she fell against something, possibly the heater or a box of toys that was there.

Miranda Quintero, another sister of appellant, testified that, once in 2007, she walked into the bathroom and saw Garcia hitting herself in the face with a brush. When Miranda yelled and asked what she was doing, Garcia said she and appellant had been arguing and that she was going to blame it on appellant.

Defense investigator Mryl Stebens testified that Garcia contacted the defense in December 2009, and he arranged to conduct a telephone interview with her, which he recorded with

Garcia's consent. A recording of the interview was played for the jury.

In the interview, Garcia told Stebens that she had exaggerated or fabricated a number of the details in her previous statements to law enforcement regarding the incident on July 28, 2009. Garcia told Stebens that after she and appellant had consensual sex and he saw her hickeys, they "started arguing back and forth." While appellant was gathering up his possessions, Garcia grabbed his bag and then grabbed appellant's arms and shoulders to keep him from leaving. Appellant threw her off and she hit "the corner of the heater, pretty hard." Garcia thought this was "probably how [she] punctured [her] lung."

(Doc. 14, Ex. A, pp. 4-11).

**DISCUSSION**

I.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.  Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

6

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson,

7

507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### III.  Review of Petitioner's Claims.

In this action Petitioner alleges that his Sixth and Fourteenth Amendment rights to a fair trial were compromised by the trial court's exclusion of the defense expert witness.  (Doc. 1, p. 8).

A.  Exclusion of Defense Expert Witness.

Petitioner contends that the trial court's exclusion of his defense expert witness denied Petitioner his constitutional right to a fair trial under the Fifth and Fourteenth Amendments.  This contention is without merit.

1.  State Court decisions.

a.  The Trial Court's Decision.

As mentioned in the 5th DCA's Statement of Facts, the defense theory was that the victim suffered rib injuries when she landed on a heater after being thrown off Petitioner's back during an argument, and not, as the prosecution maintained, as a result of a blunt force assault by Petitioner on the victim.  In support of the prosecution's case, Dr. Agrawal, the treating physician, and Laura Woods, a registered nurse and sexual assault forensic examiner, both testified that the most likely scenario for the victim's rib injuries was blunt force trauma caused by Petitioner.  However, on cross-examination, both experts agreed that the defense theory was at least possible.

Following Woods' testimony, the defense sought to present the expert opinions of Myrl Stebens as an expert on the amount of force necessary to cause a broken rib.  6 Reporter's Transcript ("RT") 1655.  A hearing was held outside the presence of the jury pursuant to California Evidence Code § 402.  6 RT 1656-1669.  Stebens testified at the hearing that he received training about the force necessary to break ribs as a technician in the military services.  Id., p. 1657.  He explained that he had attended approximately 100 autopsies either as a member of the Sheriff's Department or during his military service and that approximately 50% of the autopsies involved blunt force trauma.  Id., pp. 1657-1659. He testified that he provided training in personal defense and subduing others at an academy that he owned and operated.  Id., pp. 1657; 1667.  He also testified that he had read studies involving, and had conducted his own experiments with, pig parts.  Id., pp. 1663-1664; 1667.

8

Following Stebens' testimony, the trial court made the following ruling:

> [W]ith all due respect to Mr. Stebens to your very considerable experience in law enforcement— and I understand that that relates just not to your own law enforcement experience as an officer but in the military, all of that certainly qualifies you to testify about law enforcement matters. It does not qualify you, in the court's view, to testify to what are essentially medical matters which are the dynamics by which an injury may be sustained. I would agree completely with the defense that it is not in the general knowledge of jurors to the degrees of force of methods or dynamics by which injuries are sustained. This is a medical subject, in the court's view, or perhaps once for a medical physicist. It may go beyond that. But what's important here is it's not a matter about which a person whose [sic] been involved in law enforcement, even for many years, can testify. If that were true, then every detective who works in the homicide unit who shows up at autopsies could come in here and testify about expert opinions about how injuries are caused or how deaths occurred, because they have attended those. Every lawyer who had read a book on fingerprints could come in here and testify as a fingerprint expert. This is not the law in California as I understand it.

6 RT 1674-1677.

### b. The 5th DCA's Opinion.

The Fifth DCA rejected Petitioner's contention as follows:

> Appellant contends the trial court abused its discretion, and denied him his federal constitutional right to present a meaningful defense, by precluding Stebens from testifying as an expert on the amount of force necessary to break a rib. Appellant claims the court erroneously concluded that Stebens was unqualified to render an opinion on the subject because he lacked sufficient medical expertise. Appellant asserts that Stebens's testimony at the Evidence Code section 402 hearing "disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." Appellant highlights the defense investigator's testimony confirming that, in his extensive military and law enforcement experience, at least "100 times [he had] broken a bone or been involved in a situation where a bone has been broken." Assuming, without deciding, the trial court erred in finding Stebens unqualified to render an expert opinion on the amount of force necessary to break a rib, and appellant did not waive his constitutional claim by failing to raise it below, we conclude reversal is not required because the exclusion of Stebens's testimony did not prejudice appellant.
>
> According to appellant, if the trial court had permitted Stebens to testify as an expert, he would have testified, as a general matter, "that various factors, not simply the force, contributed to broken ribs, such as the person's size, weight, fragility, the hardness of the striking object, its nature to apply force per area, the body's position, [and] the trajectory and angle." Appellant argues that such testimony would have "contradicted Nurse Woods'[s] facile testimony that a lot of force from a pretty good blow caused the [victim's] injuries."
>
> Appellant apparently bases his understanding of Stebens's proposed testimony on the witness's answers to questions posed by the prosecutor and the trial court during the Evidence Code section 402 hearing. The prosecutor questioned Stebens, in relevant part, as follows:
>
> > "Q. Have you ever seen anybody have a broken rib from being punched?
> >
> > "A. Yes.
> >
> > "Q. And did you know how much force was required from that punch to break the rib?

9

> "A. There's two answers to that if you would allow me. I have interviewed and seen people that have had broken ribs from subsequent contact. And I've inflicted such damage.
>
> "Q. Do you know why?
>
> "A. Why what?
>
> "Q. The rib breaks and how much force is applied?
>
> "A. It really depends upon the trajectory, the angle and the force of the—of the assailant, which is this case I'm talking about myself as I applied the force. The amount of force varies depending upon the position of the body, whether it's the front or the back portion of the rib. It breaks in various patterns. Angle has a lot to do with it. If you hit it straight on you might have more of a spring effect versus a downward and upward thrust could not give that spring or absorbing factor."

The court questioned Stebens, in relevant part, as follows:

> "THE COURT: Okay. I have one question that I need to ask you, Mr. Stebens. As I understand it here from [defense counsel] a moment ago he would propose to have you testify about the amount of force it might take to break the rib of somebody in the position, essentially, of Cindy Garcia in this case, meaning her size and the rest of that. What particular experience or training do you have that would allow you to express an opinion on that particular subject?
>
> "THE WITNESS: Well, Your Honor, the only thing I can offer is based upon my training and experience and teaching is that force by and in itself is not always the necessary—it depends on the soft tissue. It depends on the weight of the individual, the hardness of the object they hit or are being hit with i.e., a baseball fast versus a fist—in this case maybe a heater, being stomped by the heel of the foot or toe of the foot or elbow. That's a contributing factor that has to be taken into consideration when force trauma is applied. All the things that have to be taken into consideration are the—well, as the individual herself stated, she's fragile; not knowing how big she is as to what the strike point was; whether it was a pointed object; PSI, pounds per square inch has something to come into it versus—a railing versus a heal of a foot, or the toe of a shoe versus a flat railing. Those—they would absorb a lot more force versus a toe coming in would have more force applied to it in a focused area. So that's really about all I can offer as far as this particular case."

Assuming, based on the forgoing, that appellant is correct in asserting that Stebens would have testified that "various factors, not simply the force, contributed to broken ribs," there is no possibility the trial court's ruling excluding this testimony was prejudicial, whether harmless error is judged under the state standard for erroneous evidentiary rulings, which we believe applicable here (People v. Cunningham (2001) 25 Cal.4th 926, 998–999; People v. Watson (1956) 46 Cal.2d 818, 836), or the elevated standard that would be required if the ruling had completely prevented appellant from establishing a defense (Crane v. Kentucky (1986) 476 U.S. 683, 691; Chapman v. California (1967) 386 U.S. 18, 24 (Chapman)).

Stebens's proposed testimony did not directly refute and would have done little to discredit Woods's testimony regarding Garcia's injuries. The nurse's opinion that it would have taken "a good blow" or "a lot of force" was elicited in direct response to a question about the amount of force it would take to cause the victim's injuries. Contrary to appellant's suggestion, her opinion did not necessarily imply that force was the only factor that could have contributed to the victim's ribs breaking, or that other factors—such as the victim's size, the hardness of the striking object, or the angle at which the victim was struck—were not contributing factors.

> Indeed, Woods went on to testify that Garcia's injuries could also be consistent with a fall, if she landed on a hard or large object. And, during cross-examination, Woods acknowledged that it was plausible that Garcia could have sustained the injuries to her ribs if she fell against a heater as described by defense counsel.
>
> Moreover, Dr. Agrawal's testimony on cross-examination essentially conveyed that various factors—such as "the body mass of the person" and "what they hit from how far"—would need to be taken into consideration to render an opinion on whether a victim could sustain rib injuries under the scenario presented by the defense. On this record, it is not reasonably probable that a result more favorable to appellant would have been achieved if the court had not excluded Stebens's proposed expert testimony that various factors, not simply the force, could contribute to broken ribs. (See People v. Rangel (1992) 11 Cal.App.4th 291, 303 [finding harmless error under more stringent Chapman standard "where the essence of the stri[c]ken testimony" was elicited through other means].)

(Doc. 14, Ex. A, pp. 11-14).

### 2. Federal Standard.

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. 62, 68, 112 S.Ct. 475, 477 (1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985). Accordingly, incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected. See Whelchel v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000) (citations omitted).

Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a defense and to present relevant evidence in their own defense. Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). This right is not unlimited, but rather, is subject to reasonable restrictions. United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

A state evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." Scheffer, 523 U.S. at 308; Crane, 476 U.S. at 689–91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"). The Supreme Court has found a violation of the right to present a complete defense in cases where a state evidentiary rule, on its face, "significantly undermined fundamental elements of

the defendant's defense," but did little or nothing to promote a legitimate state interest. Scheffer, 523 U.S. at 315; see also Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727 (2006).

         3. Analysis.

The United States Supreme Court has not "squarely address[ed] whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's right to present relevant evidence." Moses v. Payne, 555 F.3d 742, 758 (9th Cir.2009). Likewise, the Supreme Court has not squarely addressed the question of whether this discretionary decision violates a defendant's right to present a defense. Brown v. Horell, 644 F.3d 969, 983 (9th Cir.2011); Moses, 555 F.3d at 758.

The Ninth Circuit affirmed of a grant of habeas relief in Alcala v. Woodford, 334 F.3d 862 (9th Cir. 2003), which was based in part on its finding that the petitioner's due process rights were violated by the exclusion of expert testimony. However, Alcala applied the pre-AEDPA standard for habeas relief. See id. at 868, 877. Moreover, the fact that there may be Ninth Circuit authority to support a petitioner's claim of the right to habeas relief when expert testimony was excluded is insufficient to meet the AEDPA's exacting standard of review. Federal law concerning an issue is not "clearly established" within the meaning of the AEDPA unless the United States Supreme Court has addressed the issue. 28 U.S.C. § 2254(d)(1); Lopez v. Smith, ––U.S. ––––, 135 S.Ct. 1, 2 (2014) (per curiam) (AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established' "). The Supreme Court has not addressed the legal issue here. Thus, in this case, the 5th DCA's decision rejecting Petitioner's claim cannot be "contrary to clearly established federal law" and there can be no federal habeas relief in this case.

Furthermore, the 5th DCA's denial of this claim was not based on an unreasonable determination of the facts. Section 801(a) of the California Evidence Code limits expert testimony to opinions "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Also, state law stipulates that, to qualify as an expert witness, the witness must possess "special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates." Cal. Evid. Code § 720. It was a reasonable determination by the trial judge that Steben's experience in the a military services, as a deputy sheriff who attended autopsies, and as the owner of an "academy" teaching self-defense might

qualify him as an expert in law enforcement issues, but did not qualify him as an expert in medical matters such as the amount of force necessary to break ribs.

At the § 402 hearing, Stebens testified that his degrees were in criminal law, sociology, and criminal justice, that he had never studied anatomy at a university, and that he had no medical training beyond first aid.  6 RT 1659-1660.    Indeed, Stebens acknowledged that, though he had attended numerous autopsies involving blunt force trauma, he had never had any training or formal course of study relating to blunt force trauma.  6 RT 1657-1659.  In other words, Stebens' experience regarding blunt force rib trauma was entirely anecdotal and involved no formal education, training, or course of study.  While such experience might be helpful in military or self-defense situations, it did not provide Stebens with the "special knowledge, skill, experience, training, or education" to opine on medical questions that arose *outside of his own personal experiences*.  As the trial judge correctly noted, if this were not the case, then any "armchair expert" who watched documentaries and read books on a particular subject would qualify as an expert under California law.  Clearly, that is not the case; hence, the Court will not second-guess the trial court's decision to exclude Stebens' opinions.  Marshall v. Lonberger, 459 U.S. 422, 438 n. 6 (1983)(["T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules….").

Finally, even assuming the experts' testimony was improperly excluded, the error did not have "a substantial and injurious effect" on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (habeas relief for an erroneous evidentiary ruling would only be available if the error had a "substantial and injurious effect or influence in determining the jury's verdict") (internal quotation marks and citation omitted).  As mentioned, the two prosecution expert witnesses had already conceded in cross-examination that factors other than simple force could play a role in determining the extent of the injuries to the victim's ribs and that the defense theory that the victim injured herself by falling against the heater was at least possible. In that respect, Stebens' testimony to the same effect was cumulative and its exclusion did not deprive Petitioner of the right to present a defense.

Moreover, as Respondent correctly notes, Petitioner himself testified about the events in a manner that markedly differed from that of the prosecution witnesses, i.e.,  that the victim was the aggressor and jumped on Petitioner during an argument, injuring herself when Petitioner threw her off

and she fell against a hard object. Based upon the verdict, the jurors clearly believed the victim's version of events over that of Petitioner, and, in the Court's view, the presentation of Stebens' cumulative testimony about the force needed to break a rib would not have altered the jurors' decision about whom to believe. In sum, any error in excluding Stebens' testimony did not have a substantial and injurious effect on the outcome of the trial. Brecht v. Abrahamson, 507 U.S. at 637. Thus, Petitioner is not entitled to habeas relief on this claim.

Moreover, the Court declines to issue a certificate of appealability. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court;  or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denied a petitioner's petition, the court may only issue a certificate of appealability when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'."

Slack v. McDaniel, 529 U.S. 473, 484 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In the present case, the Court finds that Petitioner has not made the required substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Thus, the Court DECLINES to issue a certificate of appealability.

## **ORDER**

For the foregoing reasons, the Court **ORDERS**:

1. The petition for writ of habeas corpus (Doc. 1), is **DENIED** with prejudice;

2. The Clerk of the Court is DIRECTED to enter judgment and close the file;

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **November 12, 2015**              **/s/ Jennifer L. Thurston**
                                     UNITED STATES MAGISTRATE JUDGE